UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Richard Hopkinson,              *
                               *
           Plaintiff,         *
                               *
       v.                     *          Civil Action No. 19-cv-12290-IT
                               *
Pennsylvania Higher Education    *
Assistance Agency, doing business as  *
FedLoan Servicing, Great Lakes    *
Education Loan Services, Inc.,      *
and John Does I-X,            *
                               *
          Defendants.     *

MEMORANDUM & ORDER
January 11, 2022

TALWANI, D.J.

In this action, Plaintiff Richard Hopkinson alleges his ex-wife used his identity and name, without his knowledge, to take out student loans for their daughter's college tuition. Plaintiff alleges that Defendant Pennsylvania Higher Education Assistance Agency, doing business as FedLoan Servicing ("FedLoan"), violated Chapter 93A of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, through its correspondence with Plaintiff concerning the loans it serviced. Plaintiff alleges that Defendant Great Lakes Education Loan Services, Inc. ("Great Lakes") violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b), by failing to conduct a reasonable investigation and continuing to furnish inaccurate credit information to consumer reporting agencies ("CRAs") concerning the loans it serviced after receiving notice from the CRAs that Plaintiff was disputing the debt. Presently before the court are FedLoan's Motion for Summary Judgment [#70], Plaintiff's Motion for Partial Summary Judgment [#73] as to FedLoan, and Great Lakes' Amended Motion for Summary Judgment

[#96]. For the reasons that follow, FedLoan's Motion [#70] is ALLOWED, Plaintiff's Motion [#73] is DENIED, and Great Lakes' Amended Motion [#96] is DENIED.

## I.     Legal Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To the extent facts are disputed, they are considered in the light most favorable to the non-movant, and reasonable inferences will be drawn in that party's favor. Tolan v. Cotton, 272 U.S. 650, 655-56 (2014) (per curiam) (quoting Adickes v. S.H. Kress Co., 398 U.S. 144, 157 (1970)). "Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997) (citation omitted).

 "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). In deciding cross-motions for summary judgment, the court properly "resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has [been filed]." Wrightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996). "Barring special circumstances, the [court] must consider each motion separately, drawing inferences against each movant in turn." Tutor Perini Corp. v. Banc of Am. Sec. LLC, 842 F.3d 71, 84 (1st Cir. 2016) (quoting EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 603 n.8 (1st Cir. 1995)).

"Although it is true that 'the standards for summary judgment are highly favorable to the nonmoving party, the nonmovant . . . still has a burden to provide evidence sufficient for a

reasonable juror to find in his favor." Chiang v. Verizon New England Inc., 595 F.3d 26, 34 (1st Cir. 2010) (quoting Hinchey v. NYNEX Corp., 144 F.3d 134, 146 (1st Cir. 1998)). For this purpose, a plaintiff cannot rely on "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010). "In other words, the 'evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.'" Cadle Co., 116 F.3d at 960 (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)).

## II.    Factual Background

### A.    *The Loans, Promissory Notes, and Related Correspondence While Jacquelyn Hopkinson Was in College*

Jacquelyn Hopkinson is the daughter of Plaintiff and Carla Hopkinson, who have been divorced since approximately 2001. Plaintiff's Declaration ¶ 2 [#98-7]. In 2011, Carla Hopkinson took out two Direct Parent Plus loans to finance Jacquelyn Hopkinson's college tuition at Southern New Hampshire University. FedLoan's Statement of Material Facts ("FedLoan SOF") ¶ 1 [#72]. These loans were owned by the United States Department of Education ("Department of Education") and were serviced by FedLoan. Plaintiff Deposition ("Plaintiff Dep.") 81:6-83:22 [#72-21]; FedLoan SOF ¶ 2 [#72]. Carla Hopkinson signed the 2011 Master Promissory Note ("2011 MPN"). 2011 MPN [#72-2].

A 2011 Endorser Addendum to the 2011 MPN for these loans lists Plaintiff as the endorser for these loans. 2011 Endorser Addendum [#75-4]. The 2011 Endorser Addendum contains Plaintiff's correct home and business address, social security number, birthdate, and employer, but incorrect phone number and email address; instead, the phone number listed is the same number listed for Carla Hopkinson on the 2011 MPN and the email address's domain

name, @smd.state.maus, is not in a recognizable format. Compare 2011 Endorser Addendum 1 [#75-4] with 2011 MPN 1 [#72-2]. The email address for each reference listed for Plaintiff is cahopkinson@yahoo.com, the same email address listed for Carla Hopkinson on the 2011 MPN; both references share a last name with one of Carla Hopkinson's references on the 2011 MPN and one of the references shares an address with one of Carla Hopkinson's references. Id. The 2011 Endorser Addendum was electronically signed in Plaintiff's name from the same IP address from which Carla Hopkinson signed the 2011 MPN. 2011 Endorser Addendum 1 [#75-4]; Plaintiff's Statement of Material Facts ("Pl's SOF") ¶ 1 [#75]; FedLoan's SOF 3-4 [#72]; Investigation/Accounts Review [#72-19]. Plaintiff contends he did not sign the 2011 Endorser Addendum and the court accepts Plaintiff's assertions as true for purposes of the summary judgment motions.

By letter dated September 18, 2012, Plaintiff asked Southern New Hampshire University to "apply plus loan to the fall semester 2012-2013 to allow my daughter Jacquelyn to use any remaining funds to purchase her required books with." Great Lakes Ex. 1-K, ECF p. 141 [#89]; Plaintiff's Responses to Great Lakes Statement of Facts ("Great Lakes SOF with Pl's Responses") ¶ 13 [#98-1]. The letter provided Plaintiff's cell phone number, which matched the number listed as his work telephone number in the 2011 Endorser Addendum. See 2011 Endorser Addendum [#75-4].

Between 2012 and 2014, four Direct Parent Plus Loans, also owned by the Department of Education, were taken out in Plaintiff's name and MPNs were electronically signed in his name for each. Great Lakes Ex. 1-C, ECF pp. 33, 43, 54, 64 [#89]; Plaintiff's Declaration ¶ 3 [#98-7]. These loans were serviced by Great Lakes. Great Lakes SOF with Pl's Responses ¶¶ 4-5 [#98-1]. The 2012-2014 MPNs identify Plaintiff as the Parent-Borrower, correctly identify

4

Plaintiff's home address, phone number, and place of work, but incorrectly list his email address as cahopkinson@yahoo.com (Carla Hopkinson's email address). Great Lakes Ex. 1-C, ECF pp. 33, 43, 54, 64 [#89]; Great Lakes SOF with Pl's Responses ¶¶ 22-23 [#98-1]; Pl's Counterstatement of Facts ¶ 2 [#98-2]. The 2012-2014 MPNs list Robert Consolmagno and Philip Consolmagno as Plaintiff's references; although the 2012-2014 MPNs identified them as the borrower's grandfather and uncle, they are actually Jacqueline Hopkinson's grandfather and uncle and Carla Hopkinson's father and brother. Pl's Counterstatement of Facts ¶ 3 [#98-2]. Both Consolmagnos' email addresses are listed as cahopkinson@yahoo.com. Great Lakes Ex. 1-C, ECF pp. 33, 43, 54, 64 [#89]. The 2012-2014 Endorser Addendums are electronically signed in Robert Consolmagno's name; identify Plaintiff as the borrower, Jacquelyn Hopkinson as the student, and Philip Consolmagno and Carla Hopkinson as references; the email addresses listed for both Consolmagnos and for Carla Hopkinson is cahopkinson@yahoo.com, and the same phone number is given for both Robert Consolmagno and Carla Hopkinson. Plaintiff Ex. 2 Endorser Addendum, ECF pp. 2, 13, 23, 34 [#98-5]. Plaintiff contends he did not take out these loans and did not electronically sign the four MPNs in his name.

In addition to these Parent PLUS loans, Jacquelyn Hopkinson took out a Direct Stafford Loan in her own name.

### B. Repayment of the Loans After Jacquelyn Hopkinson's 2015 Graduation

After Jacquelyn Hopkinson graduated from college in 2015, all loans were moved into repayment status with payments becoming due in November 2015. Great Lakes Ex. 1-B, ECF p. 31 [#89]; Great Lakes SOF with Pl's Responses ¶ 15 [#98-1]; Plaintiff Dep. 33:22-24 [#72].

During 2016 and 2017, payments on the loans serviced by Great Lakes and Fed Loan were made from a joint account that Plaintiff had opened for his daughter when she was a child; Plaintiff remained a signatory on that account and periodically deposited small amounts of

5

money into it, but the money used to pay the loans came from funds deposited by Jacquelyn Hopkinson. Plaintiff Exhibit A Metro Credit Union Bank Statements [#98-8]; see also Great Lakes Ex. 1-A, ECF pp. 19-21 [#89]; Great Lakes Ex. 2 Plaintiff Dep. 41:9-46:14 [#90]; Plaintiff Dep. 30:11-33:3 [#72-21]; Pl's Objections to FedLoan's SOF 3 [#78-1].

The bank statements for this account were sent to an address in Tewksbury, not Burlington where Hopkinson lived, and were jointly addressed to Jacquelyn Hopkinson and Richard Hopkinson. Metro Credit Union Bank Statements [#98-8].

### C. Communications with the Loan Servicers

#### 1.  Communications with FedLoan

In December 2015, Plaintiff emailed FedLoan from his own email account, misterrick@comcast.net, to help his daughter set up payments from the joint account for the 2011 loan. Plaintiff Dep. 30:11-31:10; 33:22-24 [#72-21]; Pl's Objections to FedLoan's SOF 3 [#78-1].

On December 2, 2015, FedLoan told Plaintiff that payment due on November 17, 2015, on Carla Hopkinson's 2011 student loan was fourteen days delinquent and that as "endorser/co-maker" Plaintiff was "urged to make payments to bring the loans current." Ex. 6, Letters from FedLoan, ECF p. 2 [#75-7]. FedLoan warned him that if the loans remained delinquent, FedLoan might report the delinquency to the CRAs. Id.; FedLoan SOF ¶ 5 [#72].[1]

On December 10, 2015, Plaintiff emailed FedLoan that he "completed payment for the amount due" and asked whether someone could call him to set up direct debit payments. Plaintiff Dep. 20:16-22:2 [#72-21]; December 10, 2015 Email [#72-7]; FedLoan SOF ¶ 6 [#72]. That month a loan payment was made on the FedLoan serviced loans from a joint account of Plaintiff

---

[1] Hopkinson does not recall receiving this letter. Pl's Response to FedLoan's SOF 2 [#78-1].

and Jacquelyn Hopkinson, Fin. Activity Summ. [#72-4]; OPS Reporting – Web Maintenance [#72-8]; FedLoan SOF ¶ 7 [#72]; Pl's Objections to FedLoan's SOF 3 [#78-1]. On January 21, 2016, Plaintiff again contacted FedLoan about setting up direct debit payments from the same joint account. Plaintiff Dep. 34:12-36:8 [#72-21]; January 21, 2016 Email [#72-9]; Feb. 2, 2016 Email [#72-9]; FedLoan SOF ¶¶ 8-9 [#72].

In February 2018, Plaintiff first reported to FedLoan that he was a victim of identity theft. Affidavit of Leslie Schreyer ¶ 16 [#72-1]; FedLoan SOF ¶ 13 [#72]; Pl's Objections to FedLoan SOF 5 [#78-1].

On March 20, 2018, Plaintiff reported the alleged identity theft to the Burlington Police Department; the police report states Plaintiff first suspected identity theft in 2016 when he applied for a car loan and learned his credit report included open accounts he did not recognize for loans in his name. Correspondence re Identity Theft [#72-11]; FedLoan SOF ¶ 11 [#72]; Pl's Objections to FedLoan SOF 4 [#78-1]. The police report also indicates Plaintiff believed his ex-wife took the loans out in his name and that neither Plaintiff nor his daughter knew the loans were in his name. Correspondence re Identity Theft [#72-11].

In a letter dated April 13, 2018, FedLoan confirmed it received Plaintiff's application for loan discharge due to identity theft, but did not proceed because the application was incomplete. April 2018 Notice of Eligibility for Loan Discharge [#72-12]; Plaintiff Dep. 49:4-50:19 [#72-21]; FedLoan SOF ¶¶ 16-17 [#72].

Plaintiff resubmitted the application for loan discharge in March 2019 and requested the documents associated with the 2011 MPN and 2011 Endorser Addendum that bore his signature. March 2019 Notice of Eligibility for Loan Discharge [#72-13]. In response, FedLoan sent another notice stating his application remained incomplete because it was missing a notarized

signature page. Id.; Plaintiff Dep. 53:2-56:1 [#72-21]; FedLoan SOF ¶¶ 20-23 [#72].

In April 2019, Plaintiff sent letters to Equifax and Transunion, copying FedLoan, asking them to remove the loans serviced by FedLoan from his credit report. April 2019 Letter [#72-14]; FedLoan SOF ¶ 24 [#72].

In a letter dated May 14, 2019, FedLoan informed Plaintiff it would stop reporting the loans to the CRAs as it was "unable to confirm the accuracy of the tradeline[,]" but that this was not a "determination of the validity of the loan." Credit Dispute Response [#72-15]; see also FedLoan SOF ¶ 25 [#72]; Pl.'s SOF ¶ 5 [#75].

On July 12, 2019, Plaintiff sent FedLoan a letter summarizing the dispute; alleging FedLoan failed to review his identity theft affidavit or respond to his letters to the CRAs disputing the debt; and demanding $5,000 and the release of liability.[2] Chapter 93A Letter [#72-16]; FedLoan SOF ¶ 28 [#72]. FedLoan responded by relaying to Plaintiff's counsel that Plaintiff, as the endorser of the 2011 MPN, was still responsible for the debt, but that FedLoan would not report the debt to the CRAs. Letter re Student Loan Account of Richard Hopkinson [#72-17]; FedLoan SOF ¶ 31 [#72]. FedLoan also stated that Plaintiff had twice been asked to provide notarized affidavits accompanying his identity theft applications, twice failed to do so, and appended the earlier identity theft correspondence. Letter re Student Loan Account of Richard Hopkinson [#72-17].

In an August 8, 2019 letter, FedLoan again stated it would not report this loan to the CRAs but that this was not a determination as to the loan's validity. Aug. 8, 2019 Letter, ECF p.

---

[2] In his deposition, Plaintiff confirmed Experian, Equifax, and Trans Union stopped reporting the FedLoan debt in June 2019, prior to the Chapter 93A letter, but because FedLoan had not removed his name from the debt, he believed FedLoan had not responded. Plaintiff Dep. 90:1-20; 92:11-96:5 [#72-21].

4 [#75-9].

In an August 14, 2019 letter, Plaintiff's counsel requested that FedLoan "reassess" Plaintiff's identity theft application and included the notarized signature pages. Aug. 14, 2019 Letter [#72-18]; FedLoan SOF ¶ 33 [#72].

Meanwhile, between February 1, 2019, and August 17, 2019, FedLoan sent Plaintiff notices that payments on Carla Hopkinson's 2011 student loan were delinquent; that as "endorser/co-maker" Plaintiff was "urged to make payments to bring the loans current"; and that if the loans remained delinquent, FedLoan might report the delinquency to the CRAs. Pl.'s Ex. 6, Letters from FedLoan ("Delinquency Notices") ECF p. 4-5 [#75-7] (February 1, 2019 notice that payment due January 17, 2019, was 14 days delinquent); id. at 6-7 (March 18, 2019 notice that payment due on January 17, 2019, was fifty-nine days delinquent); id. at 8-9 (May 16, 2019 notice that payment due on March 17, 2019, was fifty-nine days delinquent); id. at 10-11 (June 17, 2019 notice that payment due on April 17, 2019, was fifty-nine days delinquent); id. at 12-13 (July 16, 2019 notice that payment due May 17, 2019, was fifty-nine days delinquent); id. at 14-15 (July 18, 2019 Notice that payment due June 17, 2019, was thirty days delinquent); id. at 16-17 (August 16, 2019 Notice that payment due June 17, 2019, was fifty-nine days delinquent); id. at 18-19 (August 17, 2019 Notice that payment due June 17, 2019, was sixty days delinquent).

FedLoan completed its investigation into Plaintiff's allegations of identity theft on November 8, 2019, concluding it "was able to substantiate that the claimant/endorser may be a victim of identity theft." Investigations/Account Review [#72-19]; FedLoan SOF ¶ 37 [#72].[3]

---

[3] The report noted Plaintiff's e-signature was recorded at the same IP address Carla Hopkinson used when signing other loan documents despite the fact Plaintiff did not reside there and that Plaintiff's references were Carla Hopkinson's family members. The investigation also noted Plaintiff's statement that Carla Hopkinson would have access to his social security number and other information given they were married for ten years and filed taxes jointly.

2.   Communications with Great Lakes

In March 2015, Plaintiff, using the email address misterrick@comcast.net, contacted Great Lakes and asked why his daughter's student loan correspondence was coming to him directly and in his name only, and advising Great Lakes that the loan correspondence should be in his daughter's name only and should go directly to her. Great Lakes Ex. 1-E, ECF p. 102 [#89].[4] Great Lakes responded that while it was servicing a Direct Stafford account loan in Jacquelyn Hopkinson's name, the Direct Parent PLUS loans it was servicing were in Plaintiff's name and "nontransferable" which meant he would remain the "primary on this Parent PLUS account until it's paid off." Id. at ECF p. 101. In April 2015, Plaintiff responded that he "did not at any time take a loan out in [his] name for [his] daughter Jacquelyn Hopkinson" and had only "co-signed for her once on a loan[.]"[5] Great Lakes Ex. 1-E, ECF p. 100 [#89]. He reported that he was "recently turned down for a loan based on [his] responsibility for this referenced loan that [he] never approved, applied for or signed for" and requested "any and all copies of documentation related to this loan." Id. Great Lakes responded stating that Plaintiff was "the primary borrower of this loan" and that Great Lakes would email him the MPN. Id. at 99. Plaintiff does not remember receiving the 2012-2014 MPNs in April 2015; according to Great Lakes' internal records, the MPNs were emailed and mailed to the "borrower" on April 14 or 15,

---

Investigation/Accounts Review [#72-19]. The investigation noted it appeared Plaintiff contacted FedLoan in 2015, set up direct deposit, and made payments on the loans. Id.

[4] Prior to March 2015, Hopkinson had not received any email correspondence from Great Lakes as all prior communication concerning the loans went to cahopkinson@yahoo.com. Great Lakes Ex. 1-A, ECF pp. 23-24 [#89]. Beginning in March 2015 (and for the duration of the events underlying this action), Hopkinson corresponded with Great Lakes using the email address misterrick@comcast.net. Great Lakes SOF with Pl's Responses ¶ 14 [#98-1]; Great Lakes Ex. 1-E [#89].

[5] During his deposition, Hopkinson stated that he could not remember what loan he had co-signed for but that it was not a student loan. Great Lakes Ex. 2, Plaintiff Dep. 90:1-22 [#90].

2015. Great Lakes Ex. 2 Plaintiff Dep. 94:20-95:10 [#90]; Ex. 1-A, ECF p. 23; Ex. 1-B, ECF p. 31 [#89].

In December 2015, Plaintiff emailed Great Lakes from his own email account, misterrick@comcast.net, to help his daughter set up payments for the loans from his joint account with Jacquelyn Hopkinson. See Great Lakes Ex. 1-A, ECF pp. 19-21 [#89]; Great Lakes Ex. 2 Plaintiff Dep. 41:9-46:14 [#90]; Plaintiff Dep. 30:11-31:10 [#72-21]. On December 2, 2015, when the loans serviced by Great Lakes were enrolled in autopay from the joint account, Great Lakes sent an enrollment confirmation to misterrick@comcast.net. Brown Dep. 94:4-94:24 [#98-4]; Great Lakes Ex. 1-A, ECF pp. 21-22 [#89].

Also in December 2015, Great Lakes received an email from misterrick@comcast.net stating: "Paying several student and parent loans at the same time. I need to lower payments by approx. $100[.]" Great Lakes Ex. 1-E, ECF p. 97 [#89]; Great Lakes Ex. 1-A, ECF p. 21 [#89]; Great Lakes Ex. 1-B, ECF p. 31 [#89]; Great Lakes Ex. 1-B, ECF 31 [#89].[6] Great Lakes responded with different repayment options, Great Lakes Ex. 1-E, ECF pp. 95-96 [#89], and Plaintiff asked to be switched "to the Extended Graduated Repayment Plan beginning at $249 as noted," id. at 90. Plaintiff requested confirmation that the changed had been made and that "my monthly payments will now be $249 monthly instead of $338 monthly[.]" Id. Plaintiff received an email notice on January 4, 2016, that he would receive "an updated payment schedule prior to any payments becoming due." Id. at 89.

In July 2017, Plaintiff called and emailed Great Lakes asking for all documents signed to obtain the loans; Great Lakes' log for the account states that it sent him the 2012-2014 MPNs.

---

[6] Around the same time, Jacquelyn emailed Great Lakes to ask whether this loan could be consolidated with her Stafford loan and was told it could not. Id.

Great Lakes Ex. 1-B, ECF p. 31 [#89].[7]

On January 9 and 10, 2018, Plaintiff called Great Lakes requesting a deferment based on financial difficulties and after he was told he did not qualify, he asked for the payment history associated with the loans serviced by Great Lakes. Id.; Great Lakes Ex. 1-A, ECF pp. 19-20 [#89]; Great Lakes SOF with Pl's Responses 14 [#98-1].

On February 16, 2018, Plaintiff called Great Lakes to dispute the debt, stating that his ex-wife took out these loans and signed his name on the 2012-2014 MPNs and asking for a letter stating he reported the fraud to provide to the district attorney. Great Lakes Ex. 1-B, ECF p. 31 [#89]. Great Lakes sent Plaintiff a fraud packet but told him it could not provide the letter for the district attorney. Id.; Great Lakes SOF with Pl's Responses 15 [#98-1].

On February 19, 2018, Great Lakes notified Plaintiff by letter that the materials he sent regarding his identity theft allegations did not include the required "Identity Theft Report" and that Great Lakes would "treat [Plaintiff's] claim of identity theft as incomplete/frivolous until [Great Lakes] receive[d] an Identity Theft Report," but would "report the account(s) as disputed to . . . Equifax, Experian, Innovis, and TransUnion." Great Lakes Ex. 1-F, ECF pp. 116-17 [#89]; Great Lakes SOF with Pl's Responses 15-16 [#98-1]. Great Lakes put the loans into a 60-day administrative forbearance. Great Lakes Ex. 1A, ECF p. 31 [#89]; Great Lakes SOF with Pl's Responses 15-16 [#98-1].

In March 2018, Plaintiff reported the alleged identity theft to the Burlington Police Department and completed a notarized statement with the same accusation. Great Lakes Ex. 3-D, ECF pp. 19-26 [#91]; id. Ex. 3-E, ECF p. 28; id. at Ex. 3-F, ECF pp. 30-31; Great Lakes SOF

---

[7] Calls between Great Lakes employees and Plaintiff and Jacquelyn Hopkinson were recorded but were not preserved. Plaintiff Ex. 1, Brown Dep. 190:4-13 [#98-4].

with Pl's Responses 16-17 [#98-1].

Great Lakes received Plaintiff's identity theft packet[8] on April 2, 2018, and referred it for investigation on April 3, 2018.[9] Great Lakes Ex. 1-B, ECF p. 31 [#89]; Great Lakes Ex. 3-D, ECF 19-26 [#91]; Great Lakes SOF with Pl's Responses 17 [#98-1]. Great Lakes completed two investigations into the alleged identity theft between 10:16 a.m. and 10:50 a.m. on April 3, 2018. Great Lakes Ex. 1-A, ECF p. 17 [#89]; Great Lakes SOF with Pl's Responses 17-18 [#98-1]. First, Great Lakes investigated the dispute pursuant to the FCRA by looking into whether payments were made on the account and whether the demographic information matched what Plaintiff provided in the identity theft packet. Plaintiff Ex. 1, Brown Dep. 96:2-20 [#98-4]; Great Lakes SOF with Pl's Responses 17-18 [#98-1]. Great Lakes also investigated pursuant to the Higher Education Act by again reviewing the demographic information relevant to the FCRA investigation, running various searches through LexisNexis and CLEAR to further confirm

---

[8] This packet included the police report, notarized affidavit, social security number, and photo identification.

[9] In investigating a disputed debt, Great Lakes assumes all information provided by the Department of Education is accurate and that each loan it services was originated by the person whose name appears on the MPN. Plaintiff Ex. 1, Brown Dep. 16:10-17:9 [#98-4]. Great Lakes' automated consumer dispute verification policy requires the investigator to (1) review the ID Theft report to determine which loan is disputed; (2) review the account records to "determine if loan payments were made, noting any payments as an identifiable concern in the Summary Findings FCRA section of the investigative summary with the following: *Payments were made or received by consumer on the account*"; (3) review the consumer's investigation documentation for servicing documentation, noting any wet-signature documents as "uncontested" signatures; (4) access activity documenting whether there have been any inquiries regarding repayment, deferment, forbearance"; (5) note any inquiries as identifiable concerns; (6) review account records to determine if consumer consolidated the loans; and (7) determine if the consumer can be connected to the address on the MPN(s). Plaintiff Ex. 3, ACDV ID Theft Policy, ECF pp. 6-7 [#99] (emphasis in original).

Great Lakes does not automatically investigate IP addresses where MPNs were signed, Great Lakes Ex. 1 Brown Dep. 25:8-18 [#98-4], and does not compare for inconsistencies in loan applications from year to year, instead they "make sure that [Great Lakes] can tie that borrower to that specific address and [does] not do so from year to year," id. at 79:25-80:9.

Plaintiff's demographic information, and reviewing Great Lakes' records documenting Plaintiff's correspondence with Great Lakes regarding the loans.[10] Great Lakes Ex. 1-B, ECF 31 [#89]; Plaintiff Ex. 1, Brown Dep. 17:1-23:22, 55:9-23 [#98-4]; Great Lakes Ex. 1-L, ECF pp. 143-46 [#89]. Great Lakes denied Plaintiff's identity theft request on April 3, 2018, in a letter stating "payments were made or received from borrower; requested deferment or forbearance on account; records show interest in repayment programs; Demographics info documentation received and verified by borrower." Great Lakes 1-B, ECF p. 31 [#89]; Pl's Response to Great Lakes SOF 17-18 [#98-1]; Great Lakes Ex. 3-G, ECF p. 33 [#91]. Great Lakes also requested documents from Southern New Hampshire University as part of the investigations but received them on April 13, 2018, after it had completed its investigation and denied Plaintiff's identity theft claim. Great Lakes SOF with Pl's Responses 22-23 [#98-1]; Plaintiff Ex. 1, Brown Dep. 57:22-58:18 [#98-4].

Plaintiff sent Great Lakes a letter dated April 17, 2018, stating he never made payments on the loans; had only ever requested forbearance and information concerning alternative repayment plans on behalf of Jacquelyn Hopkinson; and agreeing that the demographic information was not in dispute, but that it had been provided by Carla Hopkinson and was not verified by participating lenders. Great Lakes Ex. 3-H, ECF pp. 35-36 [#91]. In a May 1, 2018 letter, Great Lakes stated that the identity theft investigation was complete and that facts suggested Plaintiff was "aware of the account(s) being made in [his] name"; that the accounts would be returned to repayment status; and indicated he could appeal the decision by submitting

---

[10] Great Lakes states that it completed the Higher Education Act investigation on May 1, 2018, but Plaintiff disputes this fact and points to the April 3, 2018 letter denying his claim. Great Lakes Ex. 3-G, ECF p. 33 [#91]. For purposes of this summary judgment motion, the court assumes Great Lakes completed both investigations on April 3, 2018.

an appeal which Great Lakes would send to the U.S. Department of Education. Great Lakes Ex. 3-I, ECF pp. 38-39 [#91]. In a letter dated May 2, 2018, Plaintiff gave notice he was appealing and stated the investigation was also in the hands of the "Middlesex District Attorneys Special Investigation Unit" and that he would "immediately forward" "documentation [he] receive[d] from the court upon the verdict/resolution."[11] Great Lakes Ex. 1-N, ECF p. 151 [#89]. Great Lakes sent this appeal to the Department of Education. Great Lakes SOF with Pl's Responses 23 [#98-1]. Great Lakes' records show the Department of Education denied Plaintiff's appeal on May 15, 2018, Great Lakes Ex. 1-O, ECF pp. 153-55 [#89]; Plaintiff does not remember receiving this correspondence from the Department of Education, Great Lakes Ex. 2, Plaintiff Dep. 34:21-38:19 [#90].

On June 8, 2018, Great Lakes sent Plaintiff a letter acknowledging that Great Lakes received notification from the Federal Student Aid Ombudsman Group that Plaintiff was seeking to have his name removed from the loans and stating: (1) Great Lakes previously rejected Plaintiff's identity theft allegation; and (2) an administrative forbearance was placed on the account but, as of May 16, 2018, after the Department of Education denied Plaintiff's identity theft claim, Great Lakes removed the administrative forbearance. Great Lakes Ex. 1-P, ECF p. 157 [#89]; Great Lakes SOF with Pl's Responses 26 [#98-1].

On February 6, 2019, Great Lakes spoke with Jacquelyn Hopkinson regarding "payment details, payment history, monthly payments" and a payment attempt was declined due to insufficient funds. Plaintiff Ex. 1, Brown Dep. 186:21-188:16 [#98-4]; Great Lakes Ex. 1-A, ECF p. 14 [#89]. Jacquelyn Hopkinson also called Great Lake on February 7, 2019, to discuss payment history. Plaintiff Ex. 1, Brown Dep. 188:6-12 [#98-4].

---

[11] Plaintiff did not send such documents. Great Lakes SOF with Pl's Responses 24 [#98-1].

On April 9, 2019, Plaintiff sent letters to Experian, Trans Union, and Equifax disputing the debt. Plaintiff Ex. C, Credit Dispute Letters [#98-10]. On April 23, 2019, Great Lakes received an automatic credit dispute verification from Equifax. Great Lakes Ex. 1-R, ECF pp. 166-67 [#89].

On April 24, 2019, Trans Union placed a trade block on the file associated with this loan meaning the debt would not show up on Trans Union's credit reports. Great Lakes Ex. 1-A, ECF p. 13 [#89]; Plaintiff Exhibit D, Trans Union Conclusion, ECF pp. 2-7 [#98-11]. The same day Great Lakes received an identity theft report from Equifax and Great Lakes issued the same denial letter. Great Lakes Ex. 1-A, ECF p. 13 [#89]. According to Great Lakes' internal log, the denial was issued because the report contained no new information as compared to the 2018 investigation. Id. Great Lakes responded to Equifax on April 29, 2019, stating the account continued to be in dispute per prior reporting, but the disputed information was accurate. Id. The full scope of Great Lakes' 2019 investigation was to determine if Plaintiff provided additional documentation compared to what he submitted in support of his 2018 allegation of identity theft. Plaintiff Ex. 1, Brown Dep. 115:3-7 [#98-4].[12] Around this time, both Trans Union and Experian stopped reporting this debt on Plaintiff's credit report. Plaintiff Ex. D [#98-11].

Great Lakes continued to report the debt to Equifax after April 2019, and until at least May 2020, but did not report the debt to Trans Union or Experian because of the trade blocks. Great Lakes Ex. 1-S, ECF pp. 171-74 [#89]; Great Lakes Ex. 1-A ECF pp. 11- 13 [#89]. An Equifax report of the status of the loans dated May 15, 2020, reported Plaintiff's account as "Pays_As_Agreed." Great Lakes Ex. 1-S, ECF pp. 171-74 [#89].

---

[12] On April 26, 2019, Great Lakes sent Hopkinson a letter enclosing the May 2018 denial letter from the Department of Education. Great Lakes Ex. 1-Q, ECF pp. 159-62 [#89].

### D. Department of Education Resolution

In March 2021, the Department of Education removed Plaintiff as an endorser and borrower on all the loans at issue here and communicated to both servicers that they should no longer report these loans to the CRAs under Plaintiff's name. Settlement Agreement [#75-2].

## III.    Plaintiff's Motion for Partial Summary Judgment

Plaintiff has asserted a Chapter 93A claim against FedLoan and now seeks summary judgment as to liability based on the Delinquency Letters.

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A § 2. Generally, to prevail "requires a showing of conduct that (1) falls within 'the penumbra or some common-law, statutory, or other established concept of unfairness'; (2) is 'immoral, unethical, oppressive, or unscrupulous'; and (3) causes 'substantial injury to [consumers or other businesspersons].'" Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 37 (1st Cir. 2008) (quoting Serpa Corp. v. McWane, Inc., 199 F.3d 6, 15 (1st Cir. 1999) (citing PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 321 N.E2d 915, 918 (1975) (internal quotation marks omitted))). "To rise to the level of an "unfair" act or practice, the defendant's conduct must generally be of an egregious, non-negligent nature." Walsh v. TelTech Systems, Inc., 821 F.3d 155, 160 (1st Cir. 2016) (citing Baker v. Goldman, Sachs & Co., 771 F.3d 37, 51 (1st Cir. 2014)). "Under Chapter 93A, an act or practice is deceptive, 'if it possesses a tendency to deceive' and 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'" Id. (quoting Aspinall v. Philip Morris Cos., Inc., 442 Mass. 381, 813 N.E.2d 476, 486-87 (2004) (alteration in original) (quotation marks and citations omitted)). In addition, violations of the Fair Debt Collection Practices Act ("FDCPA") and the Massachusetts unfair debt collection statute, Mass. Gen. Laws ch. 93 § 94, are per se Chapter 93A violations. McDermott v. Marcus, Errico,

Emmer & Brooks, P.C., 775 F.3d 109, 22-23 (1st Cir. 2014).

Plaintiff contends that FedLoan's liability under Chapter 93A is "per se" based on violations of the FDCPA and Massachusetts debt collection statute. Plaintiff also contends that FedLoan is liable for unfair and deceptive conduct under Chapter 93A because: (1) sending Plaintiff, the endorser, correspondence that was different from the correspondence FedLoan sent to Carla Hopkinson, the borrower, amounted to unfair or deceptive conduct; and (2) sending correspondence indicating FedLoan could report the loan delinquency to CRAs after it indicated it would not report the debt was also unfair and deceptive conduct.

The court addresses each argument in turn.

### A.   *"Per Se Liability"*

Plaintiff argues that FedLoan has violated the FDCPA and the Massachusetts unfair debt collection statute, Mass. Gen. Laws ch. 93 § 94, and therefore is per se liable under Chapter 93A. As the court explained in rejecting Plaintiff's similar argument as to Great Lakes, however, Plaintiff's Chapter 93A claim "hinges on [alleged] violations of the regulations codified at 940 Mass. Codes Regs 7.07" and "the First Circuit and the [Massachusetts Supreme Judicial Court ("SJC")] have held that when a Chapter 93A claim is based on violations of regulations and/or independent statutes, plaintiffs are still required to satisfy Chapter 93A's 'substantive requirements of showing that the complained-of act was *both* unfair and deceptive *and* that it occurred in trade or commerce.'" Mot. for Reconsideration 4 [#62] (quoting McDermott, 775 F.3d at 120); see also Klairmont v. Gainsboro Rest., Inc., 465 Mass. 165, 173-77, 987 N.E.2d 1247 (2013). Thus, there is no per se liability.

### B.   *Different Correspondences*

Plaintiff argues he is entitled to summary judgment because differences in the

18

correspondence FedLoan sent to Carla Hopkinson, the borrower, and the Delinquency Notices sent to him, the endorser, made the communications to him unfair or deceptive. The correspondence to Carla Hopkinson included the loan account number and stated the default existed on "your student loans," while the Delinquency Notices addressed to Plaintiff included only the text "RE: Carla Hopkinson" and indicated a "delinquency currently exists on CARLA A. HOPKINSON'S student loans." Plaintiff argues these differences could lead an unsophisticated consumer to believe the delinquency was Carla Hopkinson's responsibility, and without the loan number, learning more or making payment would be difficult.

FedLoan contends Plaintiff is not entitled to summary judgment where the differences in these correspondences are objectively neither unfair nor deceptive and did not deceive Plaintiff. The court agrees that Plaintiff is not entitled to judgment as a matter of law. While the Delinquency Notices sent to Plaintiff omitted the loan account number, they identified the loan by including Carla Hopkinson's name and Plaintiff's relationship to the loan by describing Plaintiff as an "endorser/co-maker." These Delinquency Notices also included the date of the loan disbursement, the amount owed, the date payment was due, and the amount owed. See Letters to Richard Hopkinson [#75-7]. It may have been easier for an unsophisticated consumer to inquire about the loan if the loan account number was included, but the omission of the loan number does not lead to a Chapter 93A violation where the Delinquency Notices included multiple methods for the recipient to contact FedLoan. Moreover, Plaintiff's argument that the omission of the loan account number would make it challenging to contact FedLoan or determine the loan number is undermined by undisputed facts showing he contacted FedLoan after receiving one of these Delinquency Notices in December 2015 and that, after calling and emailing with FedLoan, direct debit payments were set up to pay the loan. Accordingly, the

differences in the Delinquency Notices do not support summary judgment on Plaintiff's Chapter 93A claim.

### C.  Statements Regarding Credit Reporting

Plaintiff next argues FedLoan's Delinquency Notices indicating the loans may be reported to CRAs after FedLoan stated it would *not* report the loans to CRAs were unfair and deceptive and could lead an unsophisticated consumer to take actions he otherwise would not.

Plaintiff contends that the letters were sent after FedLoan told him it would no longer report the loan. Plaintiff Dep. 84:9-24, 90:1-20, 92:11-93:1 [#72-21]. But while FedLoan advised Plaintiff that it was not reporting the loan to CRAs because it was "unable to confirm the accuracy of the tradeline[,]" it stated in the same letter that this was not a "determination of the validity of the loan." Credit Dispute Response [#72-15]; see also FedLoan SOF ¶ 25 [#72]; Pl.'s SOF ¶ 5 [#75]. FedLoan consistently advised Plaintiff that the loan remained valid with amounts still due throughout the period of Delinquency Notices that Plaintiff contend were unfair and deceptive. Plaintiff points to no further delinquency letters after FedLoan completed its investigation into Plaintiff's allegations of identity theft on November 8, 2019, and concluded it "was able to substantiate that the claimant/endorser may be a victim of identity theft." Investigations/Account Review [#72-19]; FedLoan SOF ¶ 37 [#72].

At the time the Delinquency Notices were sent, Plaintiff was still the endorser on the loan (this did not change until the Department of Education removed him) and the loans were still delinquent. Plaintiff does not contend that sending notices of delinquencies as to these unresolved loans was itself unfair and deceptive. That these notices included, among a set of actions FedLoan could take with respect to the delinquency, that FedLoan could report the debt may have been confusing for Plaintiff, but this does not rise to sort of unfair or deceptive conduct

needed to support a Chapter 93A claim as a matter of law. Nor does this language listing the possible consequences from a loan delinquency amount to a "threat" as Plaintiff contends.

The court notes finally that the Delinquency Notices do not amount to "credit information which is known or which should be known to be false," 15 U.S.C. § 1692e(8), or language intended to harass or embarrass Plaintiff, Mass. Gen. Laws ch. 93 § 49.

Accordingly, Plaintiff's Motion for Partial Summary Judgment is DENIED.

## IV.     FedLoan's Motion for Summary Judgment

FedLoan moves for summary judgment on three grounds: (1) to the extent Plaintiff's claim is aimed at credit reporting, it is preempted by the FCRA; (2) there can be no Chapter 93A violation where there is a good faith dispute concerning the money owed; and (3) the Department of Education, not FedLoan, is the party able to provide relief and is responsible for damages, so Plaintiff cannot prove FedLoan is responsible for Plaintiff's "substantial injury."

### A.   Preemption

FedLoan argues Plaintiff cannot maintain a Chapter 93A claim relating to credit reporting activities because the FCRA explicitly preempts such actions. Plaintiff responds that his claim concerns *threats* of credit reporting which fall under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(8) and the Massachusetts Consumer Protection Act through 940 CMR 7.07(8) and are not preempted by the FCRA.

The FCRA provides that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under § 1681s-2." 15 U.S.C. § 1681t(B)(1)(F). Chapter 93A is a requirement imposed by Massachusetts law. Accordingly, to the extent a plaintiff's "Chapter 93A claim is premised on unfair credit reporting, failure to correct credit information, or failure to investigate a disputed debt, it is preempted by the

FCRA." Cunha v. LVNV Funding, LLC, Civ. Action No. 13-11418-MLW, 2015 WL 5737134, at *5 (D. Mass. Sept. 30, 2015) (internal citation omitted); see also, Catanzaro v. Experian Info. Sol., Inc., 671 F. Supp. 2d 256, 262 (D. Mass. 2009) (Chapter 93A claims preempted because "the Court will not sanction the use of Chapter 93A as an end run around state and federal statutory schemes."). However, to the extent a plaintiff's claim is based on "other unfair and deceptive debt collection practices," it is not preempted. Cunha, 2015 WL 5737134, at *5.

Plaintiff alleges FedLoan violated the Massachusetts Consumer Protection Act by (a) making "knowingly false or misleading representations in communications as to the character, extent or amount of the debt in violation of 940 C.M.R. 7.07(2)"; (b) making "false, deceptive, and/or misleading representations, communications or means in connection with the collection of a debt in violation of 940 CMR 7.07(8)"; (c) communicating "to a person 'credit information which is known or which should be known to be false including, without limitation, the failure to communicate that a disputed debt is disputed' in violation of 940 CMR 7.07(11); and (d) seeking "the collection of money not owed by plaintiff, in violation of 940 CMR 7.07(16)." Am. Compl. ¶ 70 [#38]. Any facts dealing with correspondences between FedLoan and the credit reporting agencies would be "premised on an unfair credit reporting, failure to correct credit information, or failure to investigate a disputed debt" and, thus, "expressly preempted by the FCRA." Cunha, 2015 WL 5737134 at *5. However, Plaintiff's allegations concerning correspondence from FedLoan to Plaintiff are allegations of unfair and deceptive debt collection practices and are not preempted.

    B. *Good Faith Dispute*

FedLoan next argues it is entitled to summary judgment because there was a good faith dispute as to whether Plaintiff was the victim of identity theft. Plaintiff argues there is no "good

faith" exemption and even if there were, because FedLoan's own investigation found it was possible Plaintiff was the victim of identity theft, it would not apply.

Viewing the facts in the light most favorable to Plaintiff, when Plaintiff first corresponded with FedLoan in December 2015, he did not know he was an endorser on the loan and only contacted FedLoan to help his daughter. Plaintiff Dep. 34:12-36:8 [#72-21]. Nevertheless, by December 2015, he was aware of these loans and that his name was associated with them. Id. at 22:11-22. In 2016, Plaintiff learned the loan was negatively affecting his credit, Elec. Funds Transfer Agreement [#72-10]; however, he did not file a police report until 2018. In 2019, when FedLoan sent the letters at issue here, the question of identity theft was unresolved. And although FedLoan stopped reporting the questionable loans to the CRAs after a preliminary investigation, the dispute as to whether identity theft had occurred and whether Plaintiff owed the debt was not yet resolved. FedLoan SOF ¶¶ 18, 26 [#72]. The investigation's finding that Plaintiff was likely the victim of identity theft – on which Plaintiff relies to challenge FedLoan's argument that they there was a good faith dispute as to the debt being owed -- did not happen until after the correspondences at issue were sent (when Plaintiff finally submitted his information with a notarized signature).

Even if there is no strict "good faith" exception, which, the court finds unlikely given the case law which cites to such an exception in insurance, Duclersaint v. Federal National Mortgage Association, 427 Mass. 809, 814, 696 N.E.2d 536, and contract disputes, McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 304 (1st Cir. 2004); Jasty, 528 F.3d at 38, the undisputed facts establish as a matter of law that FedLoan did not act in an unfair or deceptive manner when sending correspondence to Plaintiff concerning the debt and FedLoan is entitled to summary judgment. The correspondence that dealt exclusively with debt collection was sent prior to

Plaintiff providing FedLoan with the requested information and notarized signature page for FedLoan to conduct its investigation into Plaintiff's claims of identity theft. Furthermore, it is undisputed that once Plaintiff provided the requested information to FedLoan, FedLoan conducted the investigation and found Plaintiff's claims regarding identity theft probable and recommended to the Department of Education (the entity that could discharge the debt) that Plaintiff be removed from the loan.[13] Given the totality of these undisputed facts, the court finds nothing in the record that would allow Plaintiff to prove a Chapter 93A violation and, thus, finds FedLoan is entitled to judgment as a matter of law.

### C.  Department of Education

FedLoan argues because only the Department of Education had the authority to remove Plaintiff from the loans at issue, even if the court found it acted in an unfair or unscrupulous manner, where it could not cause the substantial injury because it did not cause or have the power to remedy Plaintiff's injuries, it is entitled to summary judgment. Where the court found FedLoan is entitled to summary judgment it need not address this argument.

## V.   Great Lakes' Motion for Summary Judgment

The court begins with a brief overview of the FCRA and the duties it imposes on furnishers of credit information before turning to Great Lakes' arguments that it is entitled to summary judgment because Plaintiff failed to show that (1) the information sent to Equifax was inaccurate and (2) that the investigation into identity theft allegation was unreasonable.

---

[13] The court notes that FedLoan's actions appeared to have been consistent with what was contemplated by the FCRA. Namely, where a furnisher is unable to verify one way or another whether an item disputed by a consumer is inaccurate, it must modify or stop reporting that item to the CRAs. 15 U.S.C. § 1681s-2(b)(1)(E).

A. *The FCRA*

The FCRA was enacted to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007). To that end, "the FCRA imposes obligations on CRAs and users of consumer information and provides for enforcement by various federal agencies. The act also expressly creates a private cause of action, enabling consumer suits for willful or negligent noncompliance with its requirements." Chiang, 595 F.3d at 34 (citing 15 U.S.C. §§ 1681s & 1681n-o). Congress amended the FCRA, adding § 1681s-2(b), to require furnishers to investigate a disputed debt reported to CRAs to ensure furnishers are not providing inaccurate information to CRAs. Id. at 35 (citing S. Rep. No. 103-209, at 6 (1993)).

"Section 1681s-2(b) . . . outlines a furnisher's duties when a consumer disputes the completeness or accuracy of information in their credit report. Under the FCRA, consumers generally notify CRAs of such disputes." Id. at 35. "When a customer disputes credit information to a CRA, the CRA must advise the furnisher of that data that a dispute exists and provide the furnisher with 'all relevant information regarding the dispute that the agency has received from the consumer.'" Id. at 35 (quoting 15 U.S.C. § 1681i(a)(2)(A)).

Once the furnisher is notified, it must:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) . . .;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the

25

results of the reinvestigation promptly—

>   (i) modify that item of information;

>   (ii) delete that item of information; or

>   (iii) permanently block the reporting of that item of  information.

15 U.S.C. § 1681s-2(b)(1) (emphasis added).

The furnisher's investigation must be reasonable and "the reasonableness of the investigation is to be determined by an objective standard. The burden of showing the investigation was unreasonable is on the plaintiff." Chiang, 595 F.3d at 37 (citations omitted).

The FCRA provides individuals with private cause of action for violations of § 1681-2(b). Id. at 35. When a plaintiff brings an FCRA claim against a furnisher alleging the investigation was deficient, the plaintiff must "show actual inaccuracies that a furnisher's objectively reasonable investigation would have been able to discover." Id. at 30.

The reasonableness of an investigation "may vary depending on the circumstances. . . . The statute is clear that the investigation is directed at the information provided by the CRA. . . . Accordingly, the central inquiry when assessing a consumer's claim under § 1681s-2(b) is 'whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute.'" Id. at 38 (quoting Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1157 (9th Cir. 2009)).

It is undisputed that Plaintiff cleared the first threshold for an FCRA claim by sending letters to the CRAs disputing the accuracy of information contained in his file, namely the debts serviced by Great Lakes, and that the CRAs notified Great Lakes of the dispute.

### B.   Was the Disputed Information Inaccurate?

 The court turns next to the information Great Lakes provided to Equifax that Plaintiff alleges was inaccurate. "[A]bsent a showing of actual inaccuracy" the FCRA claim fails as a

matter of law." Id. at 37-38 (citing DeAndrade v. Trans Union LLC, 523 F.3d 61, 66 (1st Cir.

2008)). This is because, it "'is difficult to see how a plaintiff could prevail on a claim for

damages' based on an unreasonable investigation of disputed data 'without showing that the

disputed information . . . was, in fact, inaccurate.'" Id. at 38 (quoting DeAndrade, 523 F.3d at

67). Plaintiff identifies as the inaccuracy that he did not originate the loan and, thus reporting his

name as associated with the loan was inaccurate.[14]

　　　Plaintiff has proffered sufficient evidence from which a jury could find he was the victim

of identity theft and that the loans were not his. The 2012 communication with Southern New

Hampshire University that Great Lakes has identified concerned the earlier loan serviced by

FedLoan and not the later ones serviced by Great Lakes. While that communication connected

Plaintiff's phone number with a number on the Great Lakes' document, Carla Hopkinson would

have access to this information, as well Plaintiff's social security number, given they were

married for ten years and filed taxes jointly, as the FedLoan investigation concluded.

Investigation/Accounts Review [#72-19]. The 2012-2014 MPNs incorrectly list Plaintiff's email

address as cahopkinson@yahoo.com (Carla Hopkinson's email address), and list the same email

address for each of his alleged references. Great Lakes Ex. 1-C, ECF pp. 33, 43, 54, 64 [#89];

Great Lakes SOF with Pl's Responses ¶¶ 22-23 [#98-1]; Pl's Counterstatement of Facts ¶ 2 [#98-

---

[14] Hopkinson points to other inaccuracies in the information provided by Great Lakes to the
CRAs, including the email and other contact information for Robert Consolmagno and the fact
that Hopkinson's email address is listed as "cahopkinson@yahoo.com" however, this
information was not reported as inaccurate or disputed in Hopkinson's letters to the CRAs,
which stated that the information connecting him to the loans was "incorrect" and that he "did
not apply for or agree to take out either of these loans" and they were not taken out with his
consent but did not identify these other inaccuracies. CRAs Dispute Letters [#98-10].
Accordingly, any inaccuracies other than whether Plaintiff's name should not have been reported
with this debt are beyond the scope of this FCRA claim because Hopkinson did not report them
as required by 1681i(a)(2)(A).

2]; Great Lakes Ex. 1-C, ECF pp. 33, 43, 54, 64 [#89]. The two references, Robert Consolmagno and Philip Consolmagno, are identified as the borrower's grandfather, when they are actually Carla Hopkinson's father and brother, Pl's Counterstatement of Facts ¶ 3 [#98-2]; both Consolmagnos' email addresses are listed as cahopkinson@yahoo.com. The 2012-2014 Endorser Addendums that identify Plaintiff as the borrower provide the same phone number for both Robert Consolmagno and Carla Hopkinson. While Plaintiff contacted Great Lakes in 2015, set up direct deposit, and payments on the loans were made from his joint account with his daughter, a jury could find that these facts show only that at some point Plaintiff tried to take responsibility for the loans, not that he was complicit in obtaining the loans. As Plaintiff has noted, Trans Union and Experian (and later Equifax) blocked reporting the debt and the Department of Education later released him from the debt; on this evidence, a jury could also determine that Plaintiff was the victim of identity theft and had not taken out these loans. Accordingly, the court denies summary judgment on this ground.

### C. Was Great Lakes' Investigation Objectively Reasonable

Because a jury could find that the debt was not Plaintiff's and that the information furnished to Equifax by Great Lakes therefore was not accurate information, the court turns to Great Lakes' final ground for summary judgment, that Great Lakes' investigation was objectively reasonable as a matter of law. Great Lakes' obligation under the FCRA to investigate was triggered on April 24, 2019, when Great Lakes received an identity theft report from Equifax. Great Lakes Ex. 1-A, ECF p. 13 [#89]. Great Lakes relied on its 2018 investigation, conducted between 10:16 a.m. and 10:50 a.m. on April 3, 2018, in which it determined that payments had been made on the account and demographic information matched what Plaintiff provided in the identity theft packet. Plaintiff Ex. 1, Brown Dep. 96:2-96:20 [#98-4]; Great

Lakes SOF with Pl's Responses 17-18 [#98-1]. Great Lakes determined Plaintiff had provided no new information as compared to the 2018 investigation, see Plaintiff Ex. 1, Brown Dep. 115:3-7 [#98-4], and responded to Equifax on April 29, 2019, stating the account continued to be in dispute per prior reporting, but that the disputed information was accurate, Great Lakes Ex. 1-A, ECF p. 13 [#89].

A reasonable jury could find that this investigation was not reasonable. Although Great Lakes was not necessarily required to redo an investigation it had previously conducted, and could rely on a reasonable investigation where no new information was provided, it is important to note that the two investigations arose in different contexts. In the first, Great Lakes was responding to Plaintiff's assertion that the debt was not his, and was entitled to make a determination as to whether Plaintiff had proven that the debt was not his. In the second, FCRA obligations attached, requiring that Great Lakes conduct a reasonable investigation, and moreover, to stop reporting the disputed debt if Great Lakes did not have sufficient information to confirm it. In light of the irregularities on the face of the loan documents that would suggest that there was a substantial and unaddressed dispute as to the loan origination, Great Lakes cannot establish that the investigation was reasonable as a matter of law. Accordingly, summary judgment is denied as to this ground as well.

## VI.    Conclusion

For the forgoing reasons, FedLoan's Motion for Summary Judgment [#70] is ALLOWED, Plaintiff's Motion for Partial Summary Judgment [#73] is DENIED, and Great Lakes' Amended Motion for Summary Judgment [#96] is DENIED.

IT IS SO ORDERED.

Date:   January 11, 2022                                    /s/ Indira Talwani
                                                            United States District Judge